AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>7420 Brooke Boulevard, Reynoldsburg, Ohio, 43068 | )<br>)<br>)<br>)<br>)<br>)    Case No. 2:25·mj· 143 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See attachment "A" and the affidavit in support of the search warrant

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized):*
See attachment "B" and the affidavit in support of the search warrant

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | *Offense Description* |
|---|---|---|
| 21 U.S.C. | Sections 841, 846 | |
| 18 U.S.C. | Sections 1956, 1957 | |

The application is based on these facts:
See the affidavit in support of the search warrant

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Stephen Popp, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
FaceTime _____ *(specify relia*

Date: March 14, 2025 _____

Elizabeth A. Preston Deavers
United States Magistrate Judge

City and state: Columbus, Ohio

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Stephen Popp, being first duly sworn, hereby depose and state as follows:

**AFFIDAVIT SUMMARY**

The purpose of this warrant is to obtain a search warrant in order to seize certain property at 7420 Brooke Boulevard, Reynoldsburg, Ohio, 43068 (**Target Location**), a residence utilized by narcotics trafficker, Dedrick RICHARDSON, for items which constitute evidence, instrumentalities, and/or fruits of violations of Title 21, United States Code, Section 846 (conspiracy to distribute controlled substances), Section 841 (possess with intent to distribute controlled substances), Section 843(b) (use of telecommunication facilities for the same), and Title 18, United States Code, Section 1956(h) (conspiracy to launder monetary instruments) ("Target Offenses"), to include those items set forth in Attachment B.

Investigators believe RICHARDSON is coordinating the transportation and delivery of drugs throughout the United States, and specifically that RICHARDSON directed Tamika FORREST to pick up approximately 23 kilograms of fentanyl from ███████████████████ in Wyoming, Michigan and to deliver the drugs to an undercover law enforcement officer in March 2023.

Throughout the investigation, agents/officers have learned that RICHARDSON primarily coordinates his drug trafficking and money laundering activity via cell phone. This investigation has demonstrated that RICHARDSON does not need to physically possess drugs or bulk cash in order to facilitate these types of transactions. RICHARDSON previously pled guilty to conspiracy to distribute cocaine in 2007 and was sentenced to 228 months prison and an additional 60 months of supervised release. Currently, RICHARDSON is on federal supervised release and has indicated to his United States Probation Officer that he resides at the **Target Location**. Several surveillance operations have also confirmed RICHARDSON frequently coming and going to and from the **Target Location**.

## AGENT'S BACKGROUND AND EXPERIENCE

1.      I am currently employed by the Drug Enforcement Administration ("DEA") as a Special Agent and have been employed in this capacity since January 2014. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2.      Currently, I am responsible for investigating crimes that involve the unlawful importation and exportation of illegal narcotics, possession with the intent to distribute controlled substances, the distribution of controlled substances,

2

the use of communication facilities to further these offenses, and the related crime of laundering monetary instruments, all in violation of Title 21, United States Code, Sections 841(a)(1), 843, 846 and 952, Title 18, United States Code, Sections 1956 and 1957, and structuring money to evade reporting requirements, in violation of Title 31, United States Code, Section 5324.

3.     During my tenure as a Special Agent with the DEA, I completed the Basic Agent Training Program in Quantico, Virginia and was assigned to the Detroit Field Division where I have been since January 2014. During my tenure with DEA, I have assisted in the preparation and execution of state and federal search warrants related to narcotics investigations; I have prepared and executed my own federal search warrants; I have conducted numerous narcotics investigations; and I have been involved in narcotics and drug-related investigations involving violations of federal and state narcotics laws.

4.     In conducting these investigations, I have used a variety of investigative techniques and resources, which include, but are not limited to, conducting physical and electronic surveillance, and managing the use of cooperating sources ("CS") and informants. Through these investigations, my training and experience, and conversations with other DEA Special Agents, as well as other federal and state law enforcement personnel, I have become familiar with the methods used by narcotics traffickers to safeguard their illegal narcotics, to

3

distribute narcotics, and to collect and launder the proceeds of narcotic sales. I have received training from the DEA regarding illegal drug trafficking and money laundering methods along with other courses of training specifically related to illegal drug trafficking and money laundering.

5.     I have participated in debriefing defendants, co-conspirators, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations, and I have participated in all aspects of drug investigations, including conducting surveillance, executing searches pursuant to court ordered search warrants, and executing arrest warrants. As a result of my assignments, I have received extensive specialized training in the field of narcotics identification and investigation.

6.     Based on my training and experience, I am familiar with the methods of operation employed by narcotics traffickers and money launderers operating at the local, state, national and international levels, including those involving the distribution, storage, and transportation of illegal narcotics and the collection of money that constitutes the proceeds of narcotics-trafficking activities. I am aware that drug traffickers and money launderers commonly use cellular telephones in furtherance of their drug trafficking and money laundering activities and that the forensic review of such phones, which are often found on the drug traffickers' person or residences, often provide evidence of drug trafficking and money

4

laundering, such as communications with co-conspirators and the locations of drugs and drug proceeds.[1] I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection. I am familiar with the common appearance, packaging, and texture of controlled substances.

7.    I know that individuals involved in the manufacture, possession with intent to distribute, and distribution of controlled substances and money launderers responsible for the movement of money related to the sales of controlled substances maintain records of their narcotics transactions including, but not limited to books, ledgers, receipts, notes, and other papers relating to the manufacture, transportation, possession, and distribution of large quantities of the controlled dangerous substances.

---

[1] Based on my training and experience, I also know that sophisticated drug traffickers and money launderers will often keep multiple cellular telephones in order to keep suppliers and customers separated. Often, high-volume drug traffickers and money launderers will keep a separate telephone(s) that is/are only used to talk to the drug trafficker's supplier(s) and money launderer(s), providing a layer of protection for the supplier(s), money launderer(s) and the trafficker/money launderer. The fewer people that know of the existence of the telephone number, the less likely it is for law enforcement to discover the number.

5

8. I know that major drug dealers and money launderers often maintain records of travel including, but not limited to, tickets, transportation schedules, notes, receipts related to travel, and motel/hotel receipts.

9. I know that significant drug dealers and money launderers may also maintain financial instruments related to their drug dealings and the profits derived from those transactions including, but not limited to cash, bank checks, cashier's checks, stocks, bonds, precious metals, jewelry, furs and real estate records.

10. I know that it is common for narcotics dealers and money launderers to maintain records which identify other conspirators in their illicit narcotic trade, such as, but not limited to: computers, flash drives, thumb drives, memory cards, address/telephone books, personal notes reflecting cellular telephone numbers, photographs and video, both digital and traditional film, developed and undeveloped, and/or audio tape recordings of conversations, including those made surreptitiously, knowingly, and over telephone answering machines.

11. I know that drug dealers maintain paraphernalia used in the manufacture, packaging, cutting, and weighing of illicit narcotics in preparation for trafficking. I also know that money launderers maintain packaging and instruments (e.g., money counters, heat sealers) used to package the bulk cash proceeds derived from the sale of these illicit narcotics.

12.    I know, based on my training and experience, that the items listed in the attachment hereto to be seized are maintained in locations where the narcotic dealers and money launderers exercise direct control and dominion, such as their residences, the residences of their confederates, paramours, relatives; their businesses; and vehicles which those persons maintain in their regular control.

13.    I know that large scale narcotic traffickers and money launderers also may purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. Even though these assets are in names of others than the traffickers, these traffickers actually own and continue to use these assets, and/or exercise dominion and control over them.

14.    I know that narcotics traffickers and money launders also maintain (on hand) large amounts of currency in order to finance their on-going narcotics business or as a result of successful narcotics sales. They will also maintain their currency in locations where the traffickers and money launderers have ready access to it.

15.    I know that narcotics traffickers and money launderers secrete contraband, proceeds of narcotics sales and records of narcotics transactions as well as amounts of cash owed and obtained in secure locations within their residences, businesses, residences of associates and relatives, safe deposit boxes,

7

and/or other locations over which they have dominion and control, for ready access and to conceal these items from law enforcement authorities and criminals not trusted by these traffickers and money launderers. In order to accomplish this concealment, traffickers and money launderers frequently build stash places within these locations and maintain directions as to these locations on hand. These directions describe these stash places, their locations, and means of concealment.

16.    I know that narcotics traffickers and money launderers often utilize electronic devices to assist in the maintenance of their ongoing drug business and money laundering operations in the form of "electronic records." These records include, but are not limited to: cellular phones, tablets, computers, flash drives, memory cards, computer gaming systems, facsimile machines, currency counting machines, security systems, video equipment, and audio recording devices.

17.    I know that when narcotics traffickers and money launderers obtain significant proceeds from the distribution of narcotics, they may attempt to legitimize these profits through money laundering activities, and that to accomplish these goals, narcotics traffickers utilize, but are not limited to the following: domestic banks and their attendant services, foreign banks and financial institutions, securities brokers, professionals (such as attorneys and accountants), casinos, real estate brokers and agents, shell corporations, business fronts, and otherwise legitimate businesses which generate large quantities of U. S. currency

8

in small denominations (commonly referred to as "street money"). It is common for narcotics dealers and money launderers to exchange street money for larger denominations of currency which can be concealed in locations described previously in this affidavit.

18.     I make this affidavit, in part, on personal knowledge based on my participation in this investigation, and, in part, upon information and belief. I am familiar with the facts and circumstances of this matter. The sources of my information and belief include:

a. oral and written reports and information concerning this investigation which I have received from other Special Agents of the DEA and other law enforcement officers;

b. physical surveillance conducted by myself and by other agents and officers participating in this investigation (the results of which have been reported to me directly or indirectly);

c. information obtained from a review of telephone toll records and other records; and,

d. independent investigation conducted by DEA agents and other law enforcement officers.

19.     Except where otherwise noted, the information set forth in this affidavit has been provided to me directly or indirectly by DEA Special Agents or

9

other law enforcement officers. Unless otherwise noted, wherever stated that a statement was made, the information was provided by a law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read. All statements related herein, whether by law enforcement officers or not, are related in substance and in part, unless otherwise indicated. Information resulting from surveillance set forth is either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance.

20.     This affidavit is being submitted for the limited purpose of establishing probable cause to obtain a search warrant. Therefore, I have not set forth each and every fact that I have learned during the course of this investigation. Facts not set forth herein are not being relied upon in reaching my conclusion that search warrants should be issued. Nor do I request that the Court rely on any facts not set forth herein.

## TARGET LOCATION

21.     This application for a search warrant is for **Target Location** located in the Southern District of Ohio and described below as being used by Dedrick RICHARDSON. As discussed below, investigators seek a search warrant for the **Target Location** and believe the **Target Location** will contain documents, notes,

ledgers, currency, cellular phones, and other non-controlled substance evidence of the Target Offenses, as listed in Attachment B.

22. The search of the **Target Location** described below shall include all rooms, garages, sheds, carports, and vehicles within the curtilage that are owned or under the control of the occupants of such premises. The items to be searched for and seized are described in Attachment B of this affidavit: List of Items to be Seized.

## PROBABLE CAUSE

23. The DEA has been investigating the Dedrick RICHARDSON Drug Trafficking and Money Laundering Organization (DTMLO) since the seizure of approximately 23 kilograms of fentanyl and arrest of Tamika FORREST in Novi, Michigan on March 22, 2023. The DTMLO is responsible for obtaining United States currency from the sale of narcotics within the United States to include the Eastern District of Michigan and using various means to launder these proceeds (e.g., use of cryptocurrencies, filtering money through a legitimate business, otherwise known as a "front" business, bank wire transfers). RICHARDSON is believed to be located in Ohio and residing at the **Target Location**, while operating as the cell head of the Mexico-based DTMLO.

**March 22, 2023, arrest of Tamika FORREST and seizure of 23 kg of fentanyl**

11

24. On March 22, 2023, at approximately 9:00 p.m., agents/officers in DEA Financial Investigations Team (FIT) along with marked police vehicles operated by Oakland County Sheriff's Office (OCSO) and the Michigan State Police (MSP) established surveillance in the vicinity of the Holiday Inn Express, located at 48953 Alpha Drive, Wixom, Michigan in anticipation of a purported 20 kilogram fentanyl shipment to Detroit, Michigan which was previously negotiated between a DEA confidential source and █████████████████, a Mexican narco-trafficker based in Guerrero, Mexico. Prior to the arranged delivery of the fentanyl, on March 21, 2023, multiple calls occurred between the user of cellular telephone number ██████, identified as ███████████████ and a DEA undercover officer (DEA UC). Ultimately, on March 21, 2023, the UC was made aware that ████████████ would not be delivering the drugs to the UC.

25. On March 22, 2023, the UC was provided telephone number 614-517-8661 by the CS to contact and set up the delivery of fentanyl. Telephone number 614-517-8661 was provided to the CS by ███████████. The UC attempted to call 614-517-8661, but there was no answer. Later, on the same day, ████████ ████ provided the CS with telephone number 220-204-0510, with direction to have the UC contact in order to complete the fentanyl delivery. The UC contacted

220-204-0510, utilized by Tamika FORREST and negotiated a time and location on March 22, 2023, to meet to conduct the fentanyl delivery.

26.    Prior to this undercover meeting between the DEA UC and FORREST, members of the DEA Detroit FIG established surveillance in the area of a negotiated meet location. At approximately 10:25 p.m., DEA Task Force Office (TFO) Chad Allan observed a silver/metallic Dodge Ram pickup truck, registered to EAN Holdings (Enterprise Rentals), enter the parking lot of the Holiday Inn Express. At approximately 10:35 p.m., TFO Steve Meier observed FORREST, the sole occupant and driver of the Ram, drive through the lot and park. At approximately 10:40 p.m., TFO Allan observed the Ram depart the lot. At approximately 10:45 p.m., MSP conducted a traffic stop of the Ram near Beck and 11 Mile Road, Novi, Michigan. During the traffic stop, officers/agents seized 37 packages of suspected fentanyl, later confirmed by the DEA Lab to be 23 kilograms of fentanyl. FORREST was placed under arrest and transported to the OCSO jail.

### Tamika FORREST interviews and cellphone review

27.    During a post-*Miranda* custodial interview on the next day, March 23, 2023, FORREST told agents that on or about March 19, 2023, RICHARDSON, also known by the alias "Train," directed her to pick "something" up in Wyoming, Michigan. FORREST stated that when she arrived at the parking lot in Wyoming,

13

Michigan, RICHARDSON had further directed her to move to another location

within the parking lot where the man with the drugs was waiting for her.

FORREST stated that she did not look at the item(s) that were put into the truck

nor did she ask questions, and that she did not want to know. However, FORREST

admitted that she knew whatever she was picking up was illegal. After FORREST

picked up the item(s) in Wyoming, she called RICHARDSON and confirmed

receipt. FORREST told agents that she was intending to go to the Motor City

Casino in Detroit, Michigan but changed her mind, and decided to go to the

Hollywood Casino in Toledo, Ohio instead. FORREST explained that while she

was driving, she received a telephone call from RICHARDSON. During the call,

FORREST told RICHARDSON she was headed home. Agents know that

FORREST resides in Canal Winchester, Ohio. According to FORREST,

RICHARDSON asked her why she was heading home because the package she

had was supposed to go to Detroit. According to FORREST, she responded to

RICHARDSON by saying he never told her that before. FORREST then changed

her navigation and began driving toward Detroit. Upon conclusion of the

interview, FORREST gave agents/officers consent to search her iPhone that was

seized during her arrest.

 28. Saved contacts within the iPhone included ones for RICHARDSON.

With respect to RICHARDSON, RICHARDSON appears within the iPhone

14

several times as "train061@icloud.com", "Train", "Pinocchio", and "Dedrick".
RICHARDSON's telephone numbers and e-mail and/or Apple ID are/were listed
as:

- 614-902-2949 (Train, work; created 08/24/2021 and updated 04/19/2022)

- 413-302-2318 (Train; created 12/21/2022)

- 917-7248879 (Train; no further information)

- 667-228-6889 (Train; no further information)

- 614-615-3434 (Train; no further information)

- 380-245-6598 (Pinocchio; created 02/06/2023)

- train061@icloud.com (first created 02/21/2023)

- 202-499-2650 (Dedrick, created 04/19/2022)

- 614-571-9928 (Dedrick, created 11/24/2022)

29.     During a follow-up custodial interview on March 24, 2023, TFO
Allan showed FORREST a photograph of a chat message between her iPhone and
another person using "train061@icloud.com." After further questioning,
FORREST identified Dedrick Lamont RICHARDSON (RICHARDSON) as the
person using "train061@icloud.com". She subsequently identified a photograph of
RICHARDSON on her phone.

30.     TFO Allan also showed FORREST screenshots stored in her iPhone of mailed packages that FORREST sent to other people in the state of California. The photographs and/or packages featured in them were dated January 18, 2022, March 11, 2022, and April 5, 2022. Upon seeing the photographs, FORREST then admitted she had been buying money orders. FORREST explained that over a period of time, RICHARDSON has been giving her cash and instructing her to buy money orders and then mail them to other people. According to FORREST, RICHARDSON instructed her to send $1,000.00 in money orders at a time. FORREST stated that she normally purchased two money orders for $500.00 apiece and then mailed these individuals and addresses provided to her by RICHARDSON. Showing her each package reflected in the pictures, FORREST stated each one was money orders being sent.

31.     TFO Allan asked FORREST if she has had packages from time to time come to her home at the request of RICHARDSON. FORREST conceded that was true. FORREST was then shown photographs of screenshots containing the names of individuals corresponding to places in Mexico, as well as a handwritten list containing more names of Latin heritage. FORREST stated the photographs were probably on her iPhone because RICHARDSON has been having her send money transfers (wires) via Western Union. FORREST stated that RICHARDSON had her send funds to people in Mexico and the amounts were always limited to no

16

more than $1,000.00 at a time. With respect to the photographs of handwritten notes containing names, FORREST stated it was her handwriting and these were names of people RICHARDSON instructed her to wire money. FORREST was shown some pictures from her iPhone of Western Union money transfer receipts and screenshots indicating money transfers were completed with her iPhone. FORREST again admitted these were transfers that RICHARDSON had asked her to make. FORREST reiterated she was instructed by RICHARDSON to limit the wires to no more than $1,000.00, and she was not to send any more than one wire per day. FORREST stated RICHARDSON provided all the cash to be used to fund the wires. FORREST explained the pictures were taken and sent by her to RICHARDSON, because he required her to do so. FORREST explained the screenshots of her phone being used to send money transfers was because she had an account with Western Union and used the Western Union application to send transfers. FORREST stated the Western Union application on her phone contained a history of all the money transfers she has sent. During TFO Allan's review of FORREST's iPhone, there were chat messages between FORREST and RICHARDSON that span back to 2021, primarily involving RICHARDSON instructing FORREST so send money to different individuals, some in Mexico.

32.     The following is summarized information, and in some cases, excerpts in quotations taken from the chat between FORREST and RICHARDSON /

17

train061@icloud.com in the days leading up to and on March 22, 2023, the date of the fentanyl seizure.

- On March 12, 2023, 6:43:21 p.m., RICHARDSON sent a text to FORREST telling her to check her mailbox.

- On March 13, 2023, 2:23:27 p.m., RICHARDSON sent FORREST a digital photograph of a U.S. Postal Service receipt timestamped 03/10/2023 and identifying the post office, "Capital," 2 South 35th Avenue, Phoenix, Arizona 85009-9998. The tracking number listed on the receipt was EI497761405US.

- On March 20, 2023, 7:44:32 p.m., RICHARDSON sent FORREST a message telling her to get "a ride" and he needed to see her. FORREST responded by texting RICHARDSON back that he is a "lousy piece of shit" and told him to "lose" her number.

- On March 21, 2023, 7:16:53 p.m., RICHARDSON sent FORREST a digital photograph of the display of another smartphone being held in someone else's hand displaying navigation information from Wyoming, Michigan to Detroit, Michigan. The information on the screen display was in Spanish.

- On March 22, 2023, 11:09:14 a.m., RICHARSON texted FORREST the address: 1160 Chicago Dr SW, Wyoming, MI 49509.

- On March 22, 2023, 5:47:40 p.m., RICHARDSON sent another message to FORREST that read, "okay I'm here a truck café in the pure corner of the parking lot (sic)." Agents/officers believe this was probably cut and pasted and forwarded by RICHARDSON to FORREST after RICHARDSON received it from the courier waiting to meet FORREST at 1160 Chicago Drive SW, Wyoming, Michigan.

- On March 22, 2023, 8:02:22 p.m., RICHARDSON sent FORREST another digital photograph. The photograph depicted a smartphone being held in another person's hand displaying a navigation link for the Howell Rest Area amid other texts in Spanish. The information in the photograph indicated the person who sent the information was saved in the user's cellphone as "Paco Primo Mm" and it was bearing the time "5:50 PM" in the upper left corner of the cellphone's display screen.

- On March 22, 2023, 8:56:29 p.m., RICHARDSON sent FORREST a message asking her how long.

- On March 22, 2023, 9:05:41 p.m., a current location message was sent by FORREST (FORREST was using 220-204-0510).

19

- On March 22, 2023, 10:05:48 p.m., RICHARDSON sent FORREST another digital photograph depicting the display screen of another cellular telephone. The photograph contained "Paco Primo Mm" and "Justo ahora" in the upper left portion of the display screen and the Spanish words "1 mensajle no leido" followed by "Token: G65800904C". Per Google translate, "1 mensajle no leido" translates to "1 unread message."

- On March 22, 2023, 11:16:28 p.m., RICHARDSON sent a message to FORREST that read, "Call me by" followed by another message at 11:21:02 p.m. that read, "Back".

## RICHARDSON iCloud Account

33. On or about March 24, 2023, Special Agent (SA) Jeremy Fitch issued an administrative subpoena to Apple, Inc., requesting Apple account details related to train061@icloud.com. On or about May 8, 2023, SA Fitch received the requested information from Apple for RICHARDSON's iCloud account, which showed that "Dedrick Richardson" is associated with Apple ID: train061@icloud.com and DSID 20394798567. RICHARDSON's iCloud account was created on August 30, 2021 and was designated as an "Active" account. Phone number 614-517-8661 was provided as the "day phone", along with an address of 1775 Alum Creek Drive, Columbus, Ohio 43207-1708, a known address associated

with addiction and mental health treatment. RICHARDSON's iCloud account maintains iCloud features such as "calendars," "iCloud Photos," "Contacts," and "iCloud Drive," which were backed-up on the iCloud. The records also reflected that, "iCloud features can be turned on/off at any time by user."

34.   On June 9, 2023, SA Tyler Dollison obtained a search warrant for RICHARDSON's iCloud account, authorized by the United States Magistrate Judge Anthony P. Patti, Eastern District of Michigan, and members of DEA FIT later received the requested data. I reviewed the content of RICHARDSON's iCloud account and observed evidence of coordinating the drug transaction on March 22, 2023, and money laundering.

35.   RICHARDSON's iCloud account contained various photos and chat conversations implicating RICHARDSON's involvement in drug trafficking and money laundering as far back as October 2021. The following include chat messages and photographs found on RICHARDSON's iCloud account showing RICHARDSON's long-term involvement in the Target Offenses.

36.   RICHARDSON used 614-517-8661 (the same number ███████-███████ gave to the CS to give to the UC on March 22, 2023, to coordinate the load of fentanyl) to communicate with a prisoner by text message. The prisoner used telephone number 475-278-7598. During the conversation, RICHARDSON stated that he would send the inmate something and on October 5, 2021, at 5:09:15

21

p.m., RICHARDSON texted, "When you see Forrest that's me", based on prior investigation, it is understood that RICHARDSON is referring to Tamika FORREST. RICHARDSON also texted the prisoner, "Send me your inmate number so I can send you something." The prisoner responded, "**Raymond Mainor** 59883066". Two days later, MAINOR sent RICHARDSON the following message, "Assalaamu Alaikum my good brother. Did you get that infro I sent you. How's everything going with you out there (sic)". In response RICHARDSON wrote, "Walaikum Assalaamu ocki yeah I got it every things going according to plan gotcha this halfway house slowing a brother up but I got it (sic)" [Chat 196]. RICHARDSON was in the half-way house through BOP at this time.

37.     On March 24, 2022, at 11:18:38 p.m., the user of 614-817-4202 texted RICHARDSON, "Still ain't fucking with me huh" followed by "This is peanut". On March 26, 2022, 8:47 p.m., RICHARDSON, from 614-517-8661, texted the user of 614-817-4202, "Give your mom 3 grams for me and we'll knock it off thanks cuz" [Chat 193].

38.     On October 7, 2022, RICHARDSON, using both his iCloud and telephone 614-571-9928 (a number in FORREST's contacts for RICHARDSON) texted, "Do rock star swap phones out? I'm about to go underground for a few days. I was with dude earlier…". RICHARDSON texted a minute later, "I had to

22

check my car make sure wasn't no tracking on it". In this chat, RICHARDSON

was communicating with the user of telephone number 614-749-6338.

39.    Evidence of money laundering in the form of a digital image dated

December 12, 2022, at 7:11:18 p.m., which was displaying the screen of another

cell phone displaying information in the Spanish language. The screen displayed,

"Columbus Token L26991220M" at "4:34 p.m." and "Llamada entrante

(translated: incoming call) 4:35 p.m." From my training and experience, and

similar to other investigated drug and money laundering transactions in this

investigation, I know a "token" with a letter, followed by eight numbers, and ended

with a letter is often a serial number for a dollar bill that is used as a receipt for an

exchange of drugs or drug proceeds.



40.    Additional evidence of money laundering in the form of a digital

image dated January 13, 2023. The photograph features what appears to be the

screen of a cell phone displaying a digital image of a U.S. one-dollar bill bearing a

23

handwritten note written on the face of the bill appearing to resemble, "85 405" (serial number B23959847A). The bottom of the image also had in white digital font the words "Recibidos 185,105 Columbus".



41.     An example of the evidence of money laundering in the use of money service businesses through a digital photograph dated February 15, 2023, 5:11 p.m., featured with someone with black skin holding an RIA MSB receipt (order number US885143320) dated the same day. The receipt documented the sender was Client Number C2069151390 and displayed the partial name and address of ███████████████████████████████████████████. The receipt indicated $970.00 USD was sent to "J Jesus Farias Valencia" in Apatzingan, Guerrero, Mexico. The receipt evidence the money transfer Mandela African Market LLC, 1920 Brice Road, Reynoldsburg, Ohio 43068.

24



42.    Further evidence of RICHARDSON's involvement in the

coordination of drug trafficking in the form of a digital image created on March 22,

2023, at 7:04:36 p.m., that displayed the screen of another cell phone displaying

information in the Spanish language. The screen displayed a chat username of

"Paco Primo Mm" followed by "Token: G65800904C"

On March 22, 2023, a dollar bill bearing serial number "G65800904C" was passed

by a DEA Detroit FIG UC to serve as the receipt in the exchange of the drugs to be

received by the UC. This dollar bill was passed by the DEA Detroit FIG CS to

Mexico based broker ███████████████████ The image below appears to

show that an unidentified individual "Paco Primo Mm" received that specific

dollar bill serial number and passed the serial number to RICHARDSON. Based on

25

the facts stated earlier in this affidavit, this photograph is known to be part of the intent to deliver multiple kilograms of fentanyl to Detroit, Michigan on March 22, 2023.



43. Additional evidence of RICHARDSON's coordination in drug trafficking is a digital photograph dated March 21, 2023, featuring a photograph of another cell phone being held and displaying navigation from Wyoming, Michigan to Detroit, Michigan. The language on the navigation was in Spanish, and the fingertips of the person holding the cell phone was white skin. Based on the facts stated earlier in this affidavit, this photograph is known to be part of the intent to deliver multiple kilograms of fentanyl to Detroit, Michigan on March 22, 2023.

26



44. Further evidence of RICHARDSON's coordination in drug trafficking is a digital image dated March 22, 2023, 5:01:56 p.m., that was a photograph taken of a person holding another cell phone displaying information on it's display screen. The screen was displaying a chat in the Spanish language, but a link to the rest area in Howell, Michigan. The image captured the username, Paco Primo Mm. The messages roughly translated asked how long it would take to arrive there. Based on the facts stated earlier in this affidavit, this photograph is known to be part of the intent to deliver multiple kilograms of fentanyl to Detroit, Michigan on March 22, 2023.

27



45.     As described in this section of the affidavit, RICHARDSON's use of a

cell phone to coordinate drug transactions was revealed through various pictures

and messages stored in his Apple iCloud account. RICHARDSON's Apple ID,

train061@icloud.com was used to communicate via text message with United

States Probation Officer Morgan Nash frequently up until April 19, 2024. On

February 27, 2025, Special Agent Stephen Popp received subpoena results from

Verizon Wireless on telephone number 380-245-6598, which has been identified as

a phone number in which RICHARDSON communicates with USPO Nash, as

recent as February 2025. Subpoena results indicated that this phone number has been active since December 19, 2022, and that the device is an Apple iPhone 11. Affiant knows that Apple iPhone devices require the establishment of an Apple ID account in order to activate and use the device. Affiant believes that RICHARDSON continues to use cell phones to coordinate drug transactions and that obtaining RICHARDSON's device will lead to further evidence of drug trafficking committed by RICHARDSON.

### Surveillance at the Target Location

46.     On May 15, 2024, a grand jury in the Eastern District of Michigan, indicted Dedric RICHARDSON and others in Count One, conspiracy to distribute and possess with intent to distribute a controlled substance, more than 400 grams of fentanyl, in case number 2:24-cr-20261. The court also issued an arrest warrant for RICHARDSON.

47.     On May 22, 2024, detectives from the Franklin County Sheriff's Office in Ohio observed RICHARDSON and an unknown female exit the **Target Location** and enter a Chevrolet Tahoe bearing Ohio license plate KIM7894 registered to ███████████████.

48.     On July 9, 2024, detectives from the Franklin County Sheriff's Office in Ohio observed RICHARDSON parked in the parking lot of a Hilton Garden Inn

hotel. Detectives followed RICHARDSON to a McDonalds fast food restaurant, a Speedway gas station, and then eventually to the **Target Location**.

49.     On July 31, 2024, detectives from the Franklin County Sheriff's Office in Ohio observed RICHARDSON exit the **Target location** and enter a Chevrolet Tahoe. Detectives followed RICHARDSON to the residence of 342 Highland Avenue, Columbus, Ohio 43223. While at this location, detectives observed ███████████ exit the residence, enter a Dodge Durango, reach inside of the vehicle to retrieve some unknown items. Moments later, detectives observed ████████ walk to the driver's window of RICHARDSON's vehicle and conduct what appeared to be a hand-to-hand transaction. Based on my training and experience, this is consistent with narcotics activity. Following this meeting, detectives followed RICHARDSON back to the **Target Location**.

50.     On August 22, 2024, detectives from the Franklin County Sheriff's Office in Ohio observed RICHARDSON exit the **Target Location** and enter the Chevrolet Tahoe in which he had been previously observed driving. Detectives followed RICHARDSON to the area of ██████████████████████████. While en route to this location, RICHARDSON was observed conducting counter-surveillance. Detectives then observed RICHARDSON meet with ████████ ████████████ and hand ██████ an unknown object. Moments later, ████████

30

███████████ returned to her vehicle and departed the area. Also at this time, detectives followed RICHARDSON back to the **Target Location**.

51.     On November 20, 2024, detectives from the Franklin County Sheriff's Office in Ohio observed RICHARDSON exit the **Target Location** and depart the area in a Ford Focus bearing Ohio license plate KIM 8320 registered to Drone International Corp.

52.     On February 11, 2025, SA Stephen Popp spoke with United States Probation Officer Morgan Nash, who is overseeing Dedrick RICHARDSON. PO Nash explained to SA Popp that RICHARDSON has confirmed with PO Nash that the **Target Location** is his residence. On this date, PO Nash conducted a routine visit with RICHARDSON at the **Target Location**.

53.     Based on my training and experience, I know that traffickers and money launderers maintain phones, transactional records, and receipts which may contain evidence of their nefarious activities and such evidence may be located within the **Target Location**.

54.     As a trained and experienced money laundering investigator, I know that criminals engaged in money laundering activities must keep and maintain notes, records and information about those activities. I also know the criminals who engage in money laundering activities must communicate in order to be able to complete the criminal and/or overt acts necessary to launder money. In prior

31

investigations that I have conducted, individuals who I have investigated that have engaged in money laundering activities have sent data that represent instructions for delivery or receipt of the proceeds of specified unlawful activity (SUA), receipts, information to be used in ledger keeping, accounting or balances of monetary figures, creation or modification or altering of documents in digital format for shell companies, bank accounts, insurance policies, as well as correspondence. Evidence of these activities may exist in paper or document form and also on the users electronic devices (e.g., phones, tablets, laptops) which may be transmitted or received as digital images (photographs), digital video, digital records/writings (such as Apple's Pages, Microsoft Word, Note, Adobe PDF, etc.), digital spreadsheets (such as Apple's Numbers, Microsoft Excel, etc.) via messages (including iMessages, SMS messages, MMS messages, or similar messages) and/or email. I know that these kinds of electronic files, records, data, often contain embedded or associated date, time, and location data. I also know from my training and experience that these messages or email containing electronic files, records, photographs, video, or similar data, are kept, stored, accessed or otherwise maintained on the user's phones. Based on all the above, I believe this evidence may be located within the **Target Location**.

55.     Agents are aware that this money laundering conspiracy extends for a significant length of time and that evidence of RICHARDSON's involvement in

money laundering operations as well as links to narcotics trafficking activity evidence may exist in the **Target Location**.

## Electronic Storage and Forensic Analysis

56.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Cellular telephone:  A cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other cellular telephones or traditional "land line" telephones.  A cellular telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, cellular telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and

33

accessing and downloading information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

57.     Based on my knowledge, training, and experience, I know that electronic devices such as cellular telephones can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

58.     As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the cellular telephone device because:

     b.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

34

c. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

d. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

e. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

35

      f.  Further, in finding evidence of how a device was used, the purpose of

its use, who used it, and when, sometimes it is necessary to establish

that a particular thing is not present on a storage medium.

59.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the

warrant I am applying for would permit the examination cellular telephone devices

consistent with the warrant. The examination may require authorities to employ

techniques, including but not limited to computer-assisted scans of the entire

medium, that might expose many parts of the device to human inspection in order

to determine whether it is evidence described by the warrant.

## CONCLUSION

60.    Based on the facts articulated above, since his release to the halfway

house with the Bureau of Prisons on his prior drug trafficking conviction, Dedrick

RICHARDSON has been continuously engaging in the Target Offenses. After the

March 22, 2023, seizure of 23 kilograms of fentanyl that he coordinated with his

Mexican coconspirator, RICHARDSON continues to engage in suspected drug

trafficking. In this time, he resides at the **Target Location** and returns there after

suspected drug activity. Based on my training and experience, and the knowledge

gained from the investigation, I believe RICHARDSON uses the **Target Location**

as a storage facility for his illicit drug trafficking and money laundering activities

and there is probable cause to believe that searching the **Target Location** will produce evidence, fruits, and instrumentalities related to violations of the Target Offenses by RICHARDSON and others.

Respectfully submitted,

STEPHEN POPP
SPECIAL AGENT
DEA

Subscribed and sworn to before me on_____March 14_____, 2025

Elizabeth A. Preston Deavers
United States Magistrate Judge

37

## **ATTACHMENT A**

*Property to be searched* –

**7420 Brooke Boulevard, Reynoldsburg, Ohio 43068** is an apartment unit, located on the upper floor, northwest corner of the 4 unit complex between 7412 – 7426. The numbers "7420" are displayed on the door of the unit.



## ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED

The items to be searched for and seized include the following instrumentalities, fruits, and evidence of the possession with the intent to distribute and distribution of controlled substances; money laundering; attempts and conspiracies to commit the aforementioned crimes, in violation of 21 U.S.C. §§841, 843, 846 and 18 U.S.C. § 1956:

1. Non-narcotic evidence of controlled substance transportation, possession or distribution including records, papers, drug ledgers, tally sheets, United States currency, buyers lists, sellers lists, pay-owe sheets, records of sales, log books, computers, computer equipment, computer software, security/surveillance systems stored electronic communication devices, personal telephone/address books including electronic organizers, and date books.

2. Articles of personal property relating to the existence of a conspiracy to import, possess and distribute controlled substances, including telephone bills, photographs, and papers and documents containing lists of names and/or numbers of individuals involved in the possession and sale of controlled substances.

3. Articles of personal property relating to the obtaining, secreting, transferring, expenditure and concealment of United States currency or foreign currency, as well as assets derived from or to be used in the importation and/or sale of controlled substances, including financial records, books, receipts, records, bank statements, bank records, credit card statements, canceled checks, business records, money drafts, money orders, deposit slips, orders for or receipt of money transfer by wire, checking and saving books, financial institution statements, cashier's check receipts, passbooks, bank checks, safes, records of safety deposit boxes, storage lockers, loan statements, tax returns, business and personal ledgers, and accounting records.

4. Cellular Telephones: The cellular telephone device and any storage devices, such as SIM cards or flash memory devices attached to, inserted in or seized with the device, will be analyzed and the following data will be seized only to the extent that it contains or depicts evidence of violations of 21 U.S.C. §§ 846 and 841(a)(1) and 843(a)(5), (a)(6), and (a)(7), and 18 U.S.C. §§ 1956

and 1957, including evidence reflecting dominion and control of the device:

    a. All telephone numbers and direct connect numbers or identities assigned to the device;

    b. Call and direct connect history information;

    c. Telephone book or list of contacts; and,

    d. Stored photographs, videos and text messages.

5. Financial proceeds and articles of personal property relating to the sale of controlled substances, including United States Currency, artwork, precious metals and stones, jewelry, negotiable instruments and financial instruments including stocks, bonds, and deeds to real property.

6. Records or documents pertaining to domestic and international travel, including, but not limited to passports, travel vouchers, air travel receipts, gas receipts, hotel receipts, and meal receipts.

7. Records or documents pertaining to postal and private package delivery services, including air bills, receipts, containers, and packages.

8. Equipment to detect police activities and surveillance, including radio scanners and tape and wire transmitter detectors.

9. Documents and articles of personal property relating to the identity of the persons occupying, possessing, residing in, owning, frequenting or controlling the **Target Location** to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility and telephone bills and receipts, vehicle and/or vessel records, cancelled mail envelopes, correspondence, personal identification documents, and documents relating to obtaining false identification, including birth certificates, driver's license, immigration cards and other forms of identification in which the same person would use other names and identities other than his or her own.